## WILSON *v.* RAY.*

The contract stated in the pleadings in this case (see the opinion) is executory.

Where no time is fixed for the performance of a contract; or where it is to be performed by a certain day (the right to perform it sooner not being precluded); or where the performance depends upon a contingency which may or may not happen within a year, the contract is not within § 1 of the statute of frauds. R. S. 1843, p. 589.—1 R. S. p. 299.

But where, by its terms, a contract is not to be performed within the year; or where it cannot be performed within the year, according to the intent and understanding of the parties, as evidenced by the contract, it is within the statute.

Where the agreement of the defendant upon which suit is brought, is not, in any event, to be performed within a year, it is within the statute, although there may be other stipulations providing for contingencies that would make the plaintiff liable to the defendant within a year, and release the defendant altogether.

A promise to pay money after the expiration of a year, is as much within the statute as a promise to do any other act.

------

* The petition for a rehearing in this case was filed on the 21st of *July*, and overruled on the 10th of *November*.

VOL. XIII.—1

Although a contract may be performed on one side within a year, yet if it cannot on the other, it is within the statute.

Contracts of partnership are as much within the statute as other contracts.

A fraudulent refusal to put a contract in writing cannot have the effect of putting it in writing.

WILSON
v.
RAY.

Tuesday,
May 24.

APPEAL from the *Marion* Circuit Court.

WORDEN, J.—Complaint by *Wilson* against *Ray* "that on or about the first day of *June*, 1852, the plaintiff and one *Lawrence M. Vance* were engaged to perform a large amount of work, and to furnish a large amount of materials for the construction of what is known as the *Indianapolis* and *Cincinnati* railroad, in the doing of which work, and the furnishing of which materials, and in order to pay workmen, and furnishers for the same, it became necessary that, in the progress thereof, the plaintiff should raise a large sum of money, to-wit, 300,000 dollars. The plaintiff further says that by the contract for said work and materials with the company to whom said road belonged, they, the plaintiff and said *Vance*, were to receive the greater portion of their pay for said work and materials in the bonds of said company at 75 cents on the dollar, and did receive therefor, of said bonds, to the amount of 350,000 dollars nominally. The plaintiff further says, that in order to raise the money first aforesaid, it became necessary to borrow the same by the creation of commercial paper, from time to time, as the same might be needed, with good indorsers, in view of which necessity the said *Vance* procured one *Hervey Bates* as his indorser, acceptor, and drawer of said commercial paper, on terms then agreed on between them; and the plaintiff, in order to procure an acceptor, drawer, and indorser also as aforesaid, then and there entered into the following agreement with the defendant: The plaintiff then and there promised the defendant that if the defendant would draw, accept, and indorse said commercial paper as the same might be, from time to time, needed, along with said *Bates*, the plaintiff would pay to said defendant one-half of the amount which the plaintiff should realize on the said bonds over and above 75 cents on each dollar of said bonds, provided that

if, on said bonds, he should not realize 75 cents to the dollar, on disposal of them, the defendant would pay to the plaintiff one-half of the loss sustained by the plaintiff by reason of such disposal of them under 75 cents on the dollar; and the defendant, then and there, in consideration of said promise by the plaintiff, promised to him to draw, accept, and indorse for him as aforesaid, and to pay the plaintiff a sum of money equal to one-half of his loss on said bonds, if on the same he should realize less than 75 cents on the dollar. And the plaintiff says that the defendant did so draw, accept, and indorse for him as aforesaid. And he avers that, of said 350,000 dollars of bonds of said company, one-half, to-wit, 175,000 dollars thereof, was then and there, and until the same was disposed of as hereinafter mentioned, the property of and share falling to the plaintiff. The plaintiff further says that said bonds could not be and were not sold, or in any manner disposed of at a rate equal to 75 cents on the dollar, but on the contrary they were, with the defendant's knowledge and consent, disposed of afterwards at much less than 75 cents on the dollar, to-wit, at 60 cents on the dollar, and that the plaintiff's loss on such disposal thereof was, and is, 25,000 dollars; of all of which the defendant then and there had notice; wherefore," &c.

To this complaint the defendant answered, amongst other things, as follows, viz.:

"That the said supposed agreement upon which this suit is brought was made and entered into on the 15th day of *June*, 1852; and that said contract between *The Indianapolis and Cincinnati Railroad Company* and said plaintiff and said *Vance*, under which the said bonds named in the complaint were to be issued and paid to said plaintiff and *Vance*, was entered into on the 31st day of *January*, 1852, whereby they, the said plaintiff and said *Vance*, were to complete the work embraced in their said contract, and fully comply with their part of said contract by the first of *October*, 1853, and that according to the terms and stipulations of the last-named contract, as well as by the terms and stipulations and recitals of the first-

named agreement, the said plaintiff and the said *Vance* bound and obliged themselves to hold the said bonds, and to keep them out of the money market, and not to sell or finally dispose of them for the whole period of, and until the expiration of sixteen months from the first day of *April*, 1852, and that the said railroad company should have the right, and could, by giving thirty days' notice to the said *Vance* and *Wilson*, receive back from them the whole or any part of said bonds, by paying in money therefor 85 cents on the dollar at the city of *New York;* provided, however, that such demand to redeem said bonds should be made within sixteen months from the first day of *April*, 1852, and provided also that said *Vance* and *Wilson* should have the right, when such demand was made, to take and receive stock in said company, at par, for the full amount and face of said bonds, which bonds were to be paid to said *Vance* and said plaintiff by *The Indianapolis and Cincinnati Railroad Company*, within ten days after notice in writing from the engineer in charge of the line that the work contemplated in said contract had been fully completed; and the said plaintiff and said *Vance*, in and by the agreement first herein above mentioned, further agreed with the said *Bates* and said defendant that there should be a mutual and equal dividend between the said plaintiff, said *Vance*, said *Bates*, and said defendant, either of advance or loss on said bonds so to be received of said company under their said contract with said company, in the final disposal of said bonds, which disposal should be only made under the concurrent disposal of each of said parties. And the defendant says that the said supposed agreement and promise of said defendant upon which this suit is brought was not by its terms to be performed within one year from the time of making the same, and could not be performed within one year; and the defendant avers that the said supposed agreement was not in writing signed by the defendant, nor by any person by him lawfully authorized, and so the defendant says that said agreement was and is void."

To this paragraph the plaintiff demurred, assigning for

cause that it does not contain facts sufficient to constitute a defense, and that it appears from the paragraph that the contract might have been performed within a year from the making thereof. The demurrer was overruled, and plaintiff excepted.

The plaintiff then replied as follows, viz.:

"That at the time of the making of the contract herein sued on, the defendant was a director of the railroad company mentioned in the declaration, and also cashier of the *State Bank of Indiana*, from which bank, or some of its branches, it was then, by the parties to said contract, contemplated that the money (or a considerable portion of it) to be raised under said contract as stated in the complaint, should be borrowed. And the plaintiff says that the said *Ray*, for the fraudulent and wrongful purpose of concealing from said company, and from said bank and its branches, his said interest in said bonds, and his said contract, and his said connection with the construction of said road, as stated in the complaint, specially requested the plaintiff that the contract herein sued on should not be reduced to writing and signed by the said *Ray;* and that for said causes alone, and on said request only, said contract was not reduced to writing and signed by the defendant; of which fraudulent and wrongful purpose the plaintiff was then ignorant."

A demurrer to this replication was sustained, to which ruling exception was also taken.

On the plaintiff failing and refusing to make further reply to the defendant's answer, final judgment was rendered for the defendant, and the plaintiff appeals to this Court.

He assigns three errors—

1. In overruling his demurrer to the answer.

2. In sustaining the defendant's demurrer to his replication, and that without any judgment of *respondeat ouster.*

3. In rendering judgment to the effect that the plaintiff take nothing by his writ, and that the defendant recover of him his costs.

Against the ruling of the Court below on the demurrer

to the defendant's answer, the plaintiff assumes three positions:

1. That the contract was executed, and not merely executory, and therefore not within the statute of frauds.

2. That it might have been performed within the year; and,

3. That it was a contract of partnership between the parties, and not necessary to be reduced to writing.

The statute in force at the time the contract was entered into provides that "No action shall be brought upon any agreement that is not to be performed within one year from the making thereof, unless the promise, contract, or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized," &c. R. S. 1843, p. 589, § 1.

The provision is reënacted in the same language in the code of 1852. 1 R. S. 1852, p. 299, § 1. It is drawn from the *English* statute of Charles II., and substantially prevails in most, if not all, the states in the *Union;* hence, the decisions in *England* and the other states, under it, will throw much light upon, if not definitely settle, the questions presented.

The first proposition we think is not true in point of fact. We do not regard the contract as being executed, but as executory in its character. The promises were mutual, and dependent one upon the other for a consideration. The plaintiff, in consideration of the defendant's promise, promised the defendant one-half of what he should realize on the bonds over 75 cents on the dollar; and the defendant, in consideration of the plaintiff's promise, promised to become drawer, acceptor, and indorser, &c., for the plaintiff, and to make up to the plaintiff one-half of the loss on the bonds, should they not bring the 75 cents on the dollar. This contract when made was purely executory. No consideration passed from one to the other. The consideration of the promise of each, was the promise of the other.

This being the case, we shall not inquire whether an agreement based upon a past or executed consideration is, or is not, within the statute.

The second position assumed requires more examination.

We think it is established that where no time is fixed for the performance of the contract, or where it is to be performed by a certain day (not precluding the right to perform sooner), or where the performance depends upon a contingency which may or may not happen within a year, the contract is not within the statute. On the other hand, where, by the terms of the contract, it is not to be performed within the year; or where it cannot be performed within the year according to the intent and understanding of the parties as evidenced by the contract, it is within the statute. A late writer deduces from the authorities the following rule: "The result seems to be that the statute does not mean to include an agreement which is simply not likely to be performed, nor yet one which is simply not expected to be performed, but that it means to include any agreement which, fairly and reasonably interpreted, does not admit of a valid execution within the space of a year from the making." Browne on Stat. of Frauds, § 273.

At § 283, the same author remarks "that where the manifest intent and understanding of the parties are that the contract shall not be executed within the year, the mere fact that it is possible that the thing agreed to be done may be done within the year, will not prevent the statute from applying. Physical possibility is not what is meant, when it is said that if a verbal contract may be performed within the year, it is binding. Or to speak exactly, it is not enough that the thing stipulated may be accomplished in a less time, but such accomplishment must be an execution of the contract according to the understanding of the parties." See, also, *Boydell* v. *Drummond*, 11 East, 142; *Herrin* v. *Butters*, 20 Maine R. 119.

It appears from the answer in the case at bar, that the plaintiff had agreed with the railroad company not to put

the bonds into market, nor sell or dispose of them, until the expiration of sixteen months from the first day of *April*, 1852, more than a year after the making of the contract between the plaintiff and defendant. It further appears that this stipulation also entered into and formed a part of the contract between the plaintiff and defendant. The time was fixed by the express terms of the contract, within which the defendant could not become liable to pay any loss on the sale of the bonds. They were not to be sold until after the expiration of more than a year, and this stipulation being made a part of the contract between the plaintiff and defendant, was as binding as any other part of it. This is a substantial part of the contract. There might have been very strong reasons of a financial nature for not putting the bonds in market sooner, and the defendant might have been very unwilling to stipulate to bear a loss on the sale of them if they were to be sold before the time specified. By the terms of the agreement the defendant was not liable for any loss until the bonds were sold, and they could not have been sold until after the expiration of more than a year; hence, it is clear that the part of the agreement sued on was not to be performed within the year.

But it is insisted that the contract might have been performed within the year, notwithstanding these stipulations; that the road might have been completed, and the bonds issued to *Wilson* and *Vance*, and then the company might, before the expiration of the year, have elected to take them up at 85 cents on the dollar, in which event, the defendant would have been entitled to his share of the gain, although the year had not expired. Admitting that all this might have been done, it is not perceived how it would take the stipulation of the defendant sued upon out of the statute. The state of things supposed would bring about the contingency on which the plaintiff would, by the stipulations of the contract, be liable to the defendant; but the contingency on which the defendant was to be liable to the plaintiff, could not, by the terms of the contract, happen within the year. If the company took up their bonds at

85 cents on the dollar, the defendant, of course, was not liable. If *Wilson* and *Vance* choose to take stock in the company instead of money, as specified in the contract, the defendant was not liable. In no possible event was he liable but upon a sale of the bonds after the time limited, and a failure to realize the amount specified.

We are of opinion that where the agreement of the defendant upon which suit is brought, is not, in any event, to be performed within a year, it is within the statute, although there may be other stipulations providing for contingencies that would make the plaintiff liable to the defendant within a year, and release the defendant from liability altogether.

Agreements not to be performed within a year, are within the statute, notwithstanding a contingency may be provided for that may put an end to them within that period. Browne on Stat. of Frauds, § 281. See, also, *Harris* v. *Porter*, 2 Harring. 27.

The case at bar is very analogous to that of *Lapham* v. *Whipple*, 8 Met. 59. There *A.* sold to *B.* an interest in a patent right for a sum of money paid down by *B.*, and made an oral agreement with *B.* to repay him said sum if he, *B.*, should not, within three years, realize the same out of the profits of the patent right. The contract was held to be within the statute; that the terms of it indicated that it was not to be performed within a year; that the defendant was not to perform unless the profits for the entire three years failed to yield the sum in question, which, of course, could not be ascertained until the expiration of the three years. So, here, the defendant's stipulation was to pay a share of the loss on the bonds, if a loss should accrue upon the sale of them after the expiration of the time limited, being more than a year from the making of the contract. A sale of the bonds before the time limited would not, by the terms of the contract, involve the defendant in any liability to pay, although they should be sold at a loss.

*Lower* v. *Winters*, 7 Cow. 263, was this: The plaintiff sold to the defendant his improvements made on certain land, in *February*, 1824, to be paid for in one year from the

ensuing *March.* It was held that the improvements were no "interest in land," being merely another name for work and labor bestowed upon it, but that the agreement to pay was void, as not to be performed in a year; that payment at a day specified, precludes the idea of payment before the day.

A promise to pay money after the expiration of a year is within the statute, as much as a promise to do any other act. Browne on Stat. of Frauds, § 290.

In *Donellan* v. *Read,* 3 Barn. and Adol. 899, a doctrine was held that, perhaps, is not fully established in *England,* and is questioned by some of the Courts of this country. There a landlord who had demised certain premises for a term of years at £50 a year, agreed with his tenant to lay out £50 in making certain improvements upon them, the tenant agreeing to pay an increased rent of £5 a year during the remainder of the term, fifteen years. The landlord having done the work within a year, it was held that he might recover arrears of the £5 a year against the tenant, though the agreement was not in writing. LITTLEDALE, J., in delivering the opinion of the Court, said: "As to the contract not being to be performed within the year, we think that, as the contract was entirely executed on one side within the year; and as it was the intention of the parties, founded on a reasonable expectation that it should be so, the statute of frauds does not extend to such a case. In a case of a parol sale of goods, it often happens that they are not to be paid for until after the expiration of a longer period of time than a year, and surely the law would not sanction a defense on that ground, when the buyer had had the full benefit of the goods on his part."

The doctrine of the above case, as we understand it, is that where the contract has been entirely executed on one side within the year, in a case where it was the intention of the parties, founded on a reasonable expectation, that it should be so executed, the statute does not apply, although performance on the other side was not to take place within a year.

In *Broadwell* v. *Getman,* 2 Denio, 87, BEARSDLEY, J., de-

livering the opinion of the Court, and remarking upon the case of *Donellan* v. *Read*, *supra*, said, "But I would not be understood as yielding my assent to the principle stated. It seems to me in plain violation of the statute. * * * The agreement is entire, and if it cannot be executed fully on both sides within the year, I think it is void. What difference does it make that one party can, while the other cannot, complete the contract within the year? Such an agreement is not in terms excepted from the statute, and the reason for the enactment applies to it with full force."

We do not, however, in this opinion, wish to approve or disapprove of the case of *Donellan* v. *Read*, as it is not necessary that we should do so. The case at bar is distinguishable from it. We may remark, however, that in such cases the party would not be without remedy, although no action would lie on the contract, for he may maintain a general *indebitatus* assumpsit against the party who refuses to proceed further under the contract, and thus recover a compensation for what has been advanced and received upon it. *Vide Broadwell* v. *Getman*, *supra*, and authorities there cited. It is said that, "Where a verbal contract has been executed on one side by the conveyance of property, or the performance of services, the proper form of action to recover the value of the property or services, is upon the implied promise arising from the plaintiff's performance; implied promises not being embraced by the statute." Browne on Stat. of Frauds, § 124, *et seq.*

In the case before us, there has been no full performance on either side. To be sure, the defendant has performed that part of the contract by which he was bound to indorse, &c., but beyond this there has been no performance on either side. The plaintiff has done nothing towards performing his part of the contract. The contingency has not arisen upon which he was to perform. The part to be performed by him, was to pay to defendant a portion of the gain on the bonds. There has been no gain and he has paid nothing. He has not parted with anything, nor has the defendant received anything.

Admitting it to be true that the contract might have

been performed on the part of the plaintiff, within the year, by the railroad company taking up their bonds at 85 cents on the dollar, and the plaintiff paying to the defendant his share of the gain; yet nothing of this kind has been done. Indeed, this contract is of such a character that the facts which would render one party liable to pay the other, would release the other from any liability to pay.

The fact that there has been no performance on the part of the plaintiff, he having paid nothing, and the defendant having received nothing, very clearly distinguishes this case from *Donellan* v. *Read, supra.* The remarks of the Court in that case, would be wholly inapplicable to this.

This case is much more like *Sweet* v. *Lee,* decided some nine years after. (3 Man. and Gr. 452.)

The plaintiff, a publisher, sued the defendant upon an agreement to prepare a law book for publication, in consideration of which the defendant was to receive £80 a year for five years, and £60 a year for the remainder of his life. The agreement was held to be within the statute. In argument, it was insisted that the work might have been published during the year, but MAULE, J., remarked that although that might be, the annuity could not be paid within that time. *Donellan* v. *Read* was pressed upon the consideration of the Court, but they held, nevertheless, that the case was within the statute. This case establishes the position that, although the contract may be performed on one side within the year, yet if it cannot on the other, it is within the statute.

On the point that the contract was one of partnership between the parties, and, therefore, not necessary to be reduced to writing, we may remark that we have been referred to no authorities which sustain that position, and we know of none. A contract of partnership concerning an interest in lands, must be in writing. Story on Partnership, § 83. Admitting that the contract amounted to one of partnership between the parties (a point which we by no means decide), still it is not perceived why that should take the case out of the statute. The language of the statute covers contracts of partnership as well as any

other, and if they are not to be performed within a year, we think no action can be maintained upon them unless they are in writing.

The Court below, in our judgment, committed no error in overruling the demurrer to the answer.

Is the replication valid? We are of opinion that it is not. It cannot readily be perceived how a fraudulent refusal to put the contract in writing can have the effect of putting it in writing. The object of the statute was to require written evidence of the terms of the contract, and thereby to prevent frauds and perjuries in establishing them by parol. The construction sought would not only defeat the object of the statute by permitting parol evidence of the contract, but would open the door to frauds and perjuries still wider, by permitting parol evidence of the fraud charged in refusing to put the contract in writing. Besides this, the fraud charged was not committed upon the plaintiff, but upon the railroad company and the bank. This certainly could not injure the plaintiff.

The demurrer to the replication was properly sustained.

The remaining error relates to the manner of rendering judgment.

The statute provides that "the judgment upon overruling a demurrer, shall be that the party plead over. * * * If a party fail to plead after the demurrer is overruled, judgment shall be rendered against him as upon a default." 2 R. S. p. 123. But this statute is not applicable to the case, as the demurrer was sustained and not overruled. No error in this respect has been pointed out in the brief of counsel, and we see none. On sustaining the demurrer to the plaintiff's replication, and on the plaintiff failing and refusing to make further reply, it certainly was correct to render final judgment for the defendant.

It perhaps should be observed that a demurrer was filed to the complaint, and overruled. Counsel on both sides, in very elaborate briefs, have discussed the validity of the contract, the appellee claiming that it is void on other grounds than the statute of frauds. But we have not felt called upon to determine the questions thus raised, as we

think they do not legitimately arise in the record. The judgment of the Court below upon the demurrers to the answer and replication, in our opinion, was right, and back of that we do not choose to go, as the judgment must be the same, whether the contract should be held good or bad in other respects.

*Per Curiam.*—The judgment is affirmed with costs.

*O. H. Smith* (1), *D. M'Donald, A. G. Porter* (2), *A. A. Hammond, J. E. McDonald,* and *A. L. Roache* (3), for the appellant.

*J. Morrison, C. A. Ray,* and *H. O'Neal,* for the appellee (4).

(1) The following is an abridgement of Mr. *Smith's* argument:

The defendant demurred to the complaint. The Court overruled the demurrer, and decided that the complaint was sufficient; and, indeed, we look in vain for any possible objection to the complaint. The contract was made by parties able to contract; it is upon a good and sufficient consideration; and the complaint, under our practice, is even more special than was necessary. But we are told that, 1. "It shows the contract declared upon to be a gaming or wagering contract." To this we say, that the contract itself wholly disproves the statement. It is no more a wagering contract than any other contract where the parties agree to share in profit and loss. Besides the high moral and religious character of the parties forbids the idea that they would enter into gambling arrangements.

Again, we are told that this was a mere insurance on the part of Mr. *Ray,* and is void, not being in writing. Does this position require a serious answer? We think not. It is no more an insurance than are all contracts of joint undertaking to share in profit and loss. It has not one of the legal features of an insurance.

Again, we are told that the contract sued on was one where the plaintiff held the event in his own hands, upon which the defendant's liability depended, the plaintiff being at liberty to sell the bonds at any time, at any sacrifice, and hold the defendant liable for half the loss. To this we say, that the inducement on the part of *Wilson* would not be very strong to sacrifice the bonds at less than their value, when he had to suffer one-half the loss. Again, it was for the parties to say who should sell the bonds, and if they made *Wilson* the financial agent, who can complain of their selection? Again, in all partnership transactions, either party may sell and buy, unless expressly restrained. Again, in this case, the bonds were sold with the knowledge and assent of Mr. *Ray.* Surely he cannot complain. We maintain that this is a plain legal contract, upon sufficient consideration between parties able to contract and be contracted with, to share in the profit and loss of these bonds, over 75 cents, to the par of whatever they might be sold for; that the contract was fully performed on both sides, without objection.

It is clear that the Circuit Court held correctly that the complaint was suffi-

cient. We do not complain of that decision, nor assign it as one of the errors.

The main question is, as to the validity of the sixth paragraph of the answer. We insist that it was wholly and radically defective, and that the Circuit Court erred in overruling that demurrer, for which, if there were no other errors in the record, the case should be reversed.

This paragraph is no answer to the complaint. It is an attempt to set up the statute of frauds to a contract performed. This cannot be done. There is no principle better settled than that the statute requiring certain contracts to be in writing, only applies to executory, and not to executed contracts, like that before the Court. 2 Story on Cont., § 1015, and authorities.—11 Met. 411.—12 Barb. 90.—15 Maine R. 201. The paragraph does not deny the performance, as alleged in the complaint, but, in fact, admits it, and then sets up the statute of frauds. This, we say, is no answer to this contract, which was fully performed by both parties, even if we admit, for the sake of the argument, that it was a contract required to be in writing, which we deny, and say that this contract never was within the provisions of the statute of frauds. The law is, in all such cases, if the contract might be performed within the year, by the voluntary act of all the parties, the case does not fall within the provisions of the statute. 11 Met. 411.—4 Bing. 40.—19 Pick. 364. Tested by that rule, this case steers clear of the statute; as, if the bonds were delivered by the railroad company to *Wilson* within the year—and the answer does not deny that fact—then they could be sold within the year, and the question of profit and loss would arise within the year, as between the parties to this action.

Again, we say that this was a special partnership between *Wilson* and *Ray*, which was not required to be put in writing. *Wilson* was to furnish the bonds, *Ray* was to indorse and make the commercial paper. The bonds went into the joint stock of *Wilson* and *Ray*, at all over 75 cents to the dollar. They were sold on the joint account, with the assent of *Ray*. The parties were jointly interested in profit and loss, over the 75 cents to the dollar, by the express terms of the contract of partnership. Such partnerships are not required to be in writing. Smith's Lead. Cas. 982 to 985, and numerous authorities.

This brings us to the reply to the sixth paragraph.

The Court sustained the demurrer to this reply, and the plaintiff excepted. The Court rendered a final judgment for the defendant for costs, from which this appeal is prosecuted.

As the law stood at the time of this decision, the demurrer to the reply brought before the Court the validity of the sixth paragraph of the answer, as well as the reply. We have shown that that paragraph of the answer was no bar to the complaint, and, therefore, the demurrer to the reply should have been overruled by the Circuit Court, whether the reply was good or bad. But we maintain that the reply is a sufficient answer to the paragraph, as to the statute of frauds. It avers that the defendant, fraudulently, at his own instance, prevented the contract from being put in writing, and it does not lie in his mouth, after the contract has been performed in good faith on both sides, as if it were in writing, to contend that he can avoid its responsibilities. He cannot be permitted to take advantage of his own wrong. Both the law and common honesty forbid it. 2 Story on Cont., p. 686, § 1015. If there had been a profit to divide, no one would have received it with a better grace than

he; and, as his expectations were not realized, he ought to bear his share of the loss out of his large estate, and not be permitted to throw the whole loss upon his neighbor and friend, who has acted in good faith with him throughout the whole transaction.

Mr. *Smith's* brief recited the pleadings to which he refers. They will be found sufficiently stated in the opinion.

(2) Messrs. *M'Donald* and *Porter* submitted the following argument:

To the foregoing argument of Mr. *Smith*, we add the following observations:

*Wilson* sued *Ray* on a contract substantially as follows: *Wilson* promised *Ray* that he would pay him one-half of the excess over 75 cents to the dollar which certain railroad bonds to be received by *Wilson* should bring; and, in consideration of that promise, *Ray* promised *Wilson* to pay him one-half of the loss on said bonds, if they should bring less than 75 cents to the dollar, and to indorse for *Wilson* certain commercial paper.

To the complaint on this contract *Ray* demurred. The demurrer was overruled. We understand that *Ray*, however, still insists that the complaint is bad; and guessing from his argument below, we suppose the following objections are made to it here:

1. It was urged that *Ray's* promise was not upon a sufficient consideration. We see no ground for this argument, and we see no reason for attempting a display of learning about it. It is a very simple thing. The complaint alleges that the consideration of *Ray's* promise was our promise to divide with him the profits over 75 cents on the dollar which the bonds might bring. Here was promise for promise, which has ever been held a sufficient consideration. Chit. on Cont. 64.—Add. on Cont. 33, and the authorities there cited. The circumstance that these promises stood on contingencies makes no difference. A promise has never been held void for that.

2. Again, it was urged below that this contract was a policy of insurance, and is therefore void for want of a writing. We deny both the premises and the conclusion. We see no reason for either.

It is not true that the contract in question was a policy of insurance. In a very vague sense, any undertaking to indemnify may be called an insurance. But we need not argue that there are many valid engagements for indemnity which do not amount to policies of insurance, in the sense of that phrase in law. An indemnifying bond, a deed of conveyance with covenants of title, a warranty of the quality of goods, and a thousand other things, are in the nature of indemnities, and may depend on future contingencies, but were never thought of as policies of insurance. The fallacy is, that though a policy of insurance always supposes a contingency, yet a contingency in a contract does not necessarily suppose a policy of insurance. The contract of partnership is, as touching the matter of profit and loss, always based on a contingency; but no one ever thought that a partnership contract was, therefore, a policy of insurance.

But we deny the conclusion. "There is nothing in the common law of *England* which appears to render it absolutely necessary that contracts of insurance should be in writing." Ang. on Ins., § 19. And certainly, we have no statute, nor any usage amounting to law, in this state, requiring a writing in contracts of this kind.

3. It has been argued that this is a wagering policy, and a mere violation of our law against gaming.

*First.* It is no wagering policy, because, as we have shown, it is no policy at all; and because a wagering policy is only where there is an insurance "without some interest in the subject-matter" on the part of the person insured. Ang. on Ins., Introduction, §§ 17, 18. Even a wagering policy was valid at common law (*Crawford* v. *Hunt*, 8 T. R. 13); and they were only rendered void by statute of 29 Geo. II., not in force here. The only question, therefore, is, was this contract a game or wager within our statute against gaming?

*Second.* This contract is no violation of our law against gaming. All the law we have on this subject is as follows: "Every person who shall, by playing or betting at or upon any game or wager, either lose or win any article of value, shall be fined," &c. 2 R. S. p. 435. The legal acumen which can discover in the contract under consideration any violation of this statute, must be keen indeed. This statute must, like any other criminal law, be construed strictly. No case can be within it, unless both the spirit and letter of the statute are violated; and we might as well say that the contract violates our usury or election laws, as that it violates our gaming laws? In the contract sued on, was there any playing, any betting, any game, any wager, any winning? Surely not. There can be no violation of this or any other criminal law, without an unlawful intent. The act and the bad motive are indispensable ingredients in every crime and every misdemeanor. Does it appear from the record that such motive existed in the present case?

The appellee has entirely mistaken the nature of this contract. In his eager search after a defense, he has fancied that it must be a policy of insurance, or it must be a wagering policy within the statute of 29 Geo. II., or it must be a gaming contract—he does not seem to know exactly which. It is strange that his fruitful imagination had not stumbled on the obvious conclusion that it is simply a partnership contract.

That it is a contract of partnership, we do not doubt. It possesses every quality which enters into the definition of a partnership. "The very essence of the contract" of partnership, says *Story*, is "a community of interest in the profits of the business of the partnership; that is to say, a joint and mutual interest in the profits thereof, or a communion of profit." Story on Part., § 18. Other writers say that its essence consists in the community of profit and loss. *Story* is the more accurate; because it is certain that community of expected profit will make a partnership, though one of the parties agrees to bear all losses. But however this may be, it is perfectly clear that in the contract in this case, there was an agreement both to share in the profit equally, and mutually to be responsible for loss. It must, therefore, be a partnership.

If it be said that this contract cannot amount to a partnership, because it had reference only to a single transaction, we answer that it is certain a partnership may have relation to a single transaction only. Story on Part., § 75. —3 Kent's Comm. 30. "To be sure," says Lord MANSFIELD, "there may be a confined partnership." *Willet* v. *Chambers*, Cowp. 816. See, also, *De Berkom* v. *Smith*, 1 Esp. 29. There may be a partnership even as to a bill of exchange. 3 Kent's Comm. 30.

Will it be said that here was no partnership, because there was no joint interest in the property, but only in the profit and loss? We answer in the language of *Chitty*, "that the right to participate in profits, and the liability to contribute to losses, create a partnership, however unequal the shares may be, and although one party has no direct interest in the capital of the firm." Chit. on Cont. 213.

In the language, then, of Lord ELDON, in *Langdale's* case, 18 Ves. 300, "The true criterion is whether they are to participate in profit," in determining whether persons are partners. Tested by that criterion, there cannot be a doubt that *Wilson* and *Ray* were partners in this transaction.

Upon the whole, we feel confident that the complaint is good, and that no difficulty can arise as to it.

We also suggest that, since it is now the doctrine that to avail ourselves of a decision on demurrer, there must be an exception to that decision; and that since, according to the doctrine of *White* v. *Allen*, 9 Ind. R. 562, the appellee cannot insist on such exception, "where there are no cross errors assigned," it may not, as this case stands, be competent to inquire into the validity of the complaint. Still, however, we care very little whether the inquiry be made or not, as we think it can result in no harm to us.

The defendant below filed an answer containing various paragraphs; but we do not deem it necessary to allude particularly to any of them except the sixth, to which we demurred. The Circuit Court held that demurrer not well taken, and overruled it. To that ruling we excepted. As the decision of the case will probably turn on the validity of that paragraph as a defense, we here copy it, as it is found in the transcript. It is as follows: [See opinion.]

Demurrer to said sixth paragraph, as follows:

"The plaintiff demurs to the sixth paragraph of the defendant's answer—

"1. For the cause that the same does not contain a statement of facts sufficient to constitute a defense to this action.

"2. Because by said paragraph it appears that the contract herein sued on might have been performed within a year from the making thereof."

The demurrer was overruled, and the plaintiff excepted.

The plaintiff then filed a reply to the sixth paragraph of the answer. It is as follows: [See opinion.]

To this reply the appellee demurred as follows:

"And the defendant demurs to said plaintiff's reply to the sixth paragraph of the defendant's answer, because it does not set forth facts sufficient to constitute a cause of action against the defendant, and shows to the Court the following cause of demurrer:

"1. That said reply merely alleges a reason for not making the said supposed contract in writing.

"2. That said reply is merely an attempted slander of the defendant, and that under cover of a regular pleading in Court."

This demurrer was sustained, and the appellant excepted.

The Court then, without any order on the appellant to plead over, rendered final judgment against him.

Upon this state of the case, we submit that the Circuit Court erred in the following particulars, all of which are stated in our assignment of errors on the transcript:

I. Said Circuit Court erred in overruling the appellant's demurrer to the sixth paragraph of the appellee's answer.

That paragraph attempts to set up as a defense that provision of our statute of frauds which renders invalid "any agreement that is not to be performed within one year from the making thereof, unless the promise, contract, or agreement" be written and signed. 1 R. S. p. 300.

May Term, **1859.**

WILSON
v.
RAY.

As this provision of our statute is a copy from the *English* statute of frauds, on which numerous decisions have been made, there will be no difficulty in ascertaining its exact meaning, nor any necessity of multiplying citations of authority touching it.

The case of *Fenton* v. *Emblers*, 3 Burr. 1278, settles the construction of this provision. In that case it is laid down, "That the statute of frauds plainly means an agreement not to be performed within the space of a year, and expressly and specifically so agreed. A contingency is not within it, nor any case that depends upon contingency. It does not extend to cases where the thing only may be performed within a year."

In *Moore* v. *Fox*, 10 Johns. 244, it is held that if the thing may be performed within the year, it is not within the act.

The same doctrine is abundantly sustained in the leading case of *Peter* v. *Compton.* See it and the notes in 1 Smith's Lead. Cas., side p. 143.

This rule has been fully recognized also by this Court in *Wiggins* v. *Keizer*, 6 Ind. R. 252. That was a much stronger case in favor of the statute of frauds than the present. In that case, the promise was to maintain a child more than six years; and yet it was held not to be within the statute of frauds, because "the child may have died within a year."

This, then, being the rule, the only question is, does the sixth paragraph of the answer disclose a contract which in no event could have been performed within the year? We say the paragraph shows a contract which might have been performed within a year, and which, at the time when made, it was probable even would be performed within a year. We think we can demonstrate this proposition.

It should be observed that the paragraph is a defense by way of confession and avoidance. It admits the whole matter in the complaint; but it attempts to avoid it by the addition of new matter, namely, that the contract stated in the complaint was a verbal contract, not to be performed within a year.

Now it is certain, that to make a good defense, there must be such averments (taking the declaration as admitted) as will plainly show that under no circumstances could the contract be performed within a year after it was made. This the pleader evidently saw he was bound to do. But unfortunately for his defense, in his attempt to do so he has shown a state of facts by which it is made manifest that the contract might have been performed within the period fixed by the statute. That state of facts is plainly seen in that part of the paragraph which reads thus :

"Said plaintiff and said *Vance* were to complete the work embraced in their said contract (on which the bonds were to be paid), and fully comply with their part of said contract by the first of *October*, 1853, and that according to the terms and stipulations of said last-named contract (to do the work for the bonds), as well as by the terms and stipulations and recitals of the first-named agreement (the contract sued on), the said plaintiff and said *Vance* bound and obliged themselves to hold the said bonds, and to keep them out of market,

and not to sell nor finally dispose of them for the whole period of, and until the expiration of sixteen months from the first day of *April,* 1852; and that said railroad company should have the right, and could, by giving thirty days' notice to the said *Vance* and *Wilson,* receive back from them the whole or any part of said bonds, by paying in money therefor 85 cents on the dollar, at the city of *New York;* provided, however, that such demand to redeem said bonds should be made within sixteen months from the first day of *April,* 1852." ·

Now, upon these allegations, the following things appear to be certain and beyond all doubt:

1. The work on which the bonds were to be paid might have been performed within the year after the contract sued on was made, and the bonds might have been paid to *Wilson* within that time; because it is said the work was to be done, not at the end of any period, but "by the first of *October,* 1853," and because it appears that the "bonds were to be paid to said *Vance* and said plaintiff within ten days after notice in writing from the engineer in charge of the line, that the work contemplated in said contract had been fully completed." We need not stop here to argue that where a man agrees to do a thing by a fixed day, or within a fixed time, he may do it before that day, or on any day within that time."

2. It is certain, that, by the contract on which the railroad company was to pay the bonds, *Wilson* might have realized 85 cents on the bonds within the year after he made the contract with *Ray;* because it was expressly stipulated that the company "should have the right," "by giving ten days' notice," to "receive back from them the whole or any part of said bonds, by paying in money therefor 85 cents at the city of *New York;*" and this they might do at any time "within sixteen months from the 1st day of *April,* 1852."

3. It follows, therefore, with equal certainty, that, not only the contract sued on, but all the contracts stated in the record, might have been performed within a year after they were made.

Now, let us test this reasoning thus: Suppose that *Vance* and *Wilson* had completed their railroad contract in six months from the time of making it; and suppose that, upon ten days' notice immediately thereafter by the engineer, the company had paid them for their work in the bonds in question; and suppose that two months thereafter the company had, on thirty days' notice to *Vance* and *Wilson,* paid them 85 cents to the dollar in cash on their bonds, and taken them back; and suppose, further, that *Wilson* had then divided with *Ray* the profit, according to the contract sued on :—supposing all this, can any one doubt that these transactions would have been a perfect performance of all the contracts named in the record? Surely no one can doubt it. Surely no one can say that these supposed transactions would not have been a perfect and legal fulfillment of all these contracts, both in their letter and spirit, and no departure from them in any respect whatever. Now, we repeat, it is certain that all this might have been done. It is thus demonstrable that the contract sued on might have been performed within a year from the making thereof.

But let us alter a little the foregoing supposition, and let us suppose that all was done as above stated within the year, except the division of the excess over 75 cents on the dollar between *Wilson* and *Ray;* and instead of that, let us suppose that *Ray* had sued *Wilson* for *Ray's* share of this excess. In such a case, could *Wilson* have pleaded this provision of the statute of frauds?

Certainly not. And just as certainly *Ray* cannot plead it when he is sued, and precisely for the same reason, namely, it was a contract which might have been performed within a year after it was made.

(3) Messrs. *Hammond, McDonald,* and *Roache* submitted a petition for a re-hearing, as follows:

In this case, the counsel ask for a new hearing, not only on account of the magnitude of *Wilson's* interest, but also on account of the general importance of the principles involved—or, rather of the application of principles well settled to the facts of this case.

The point we desire the Court to review arises on the sixth paragraph of the answer. We contend the demurrer should have been sustained to that paragraph, not because it is not in itself a good answer; but because it is not responsive to the complaint. It admits the allegations in the complaint, but seeks to avoid them by setting up new matter—the statute of frauds—that the contract was not to be performed within a year.

We contend that the complaint shows the contract sued on to have been executed so far as to take it out of the statute.

In the learned and elaborate opinion of the Supreme Court, the doctrine that an executed contract is not within the statute, is fully recognized; and the Court place their judgment on the ground expressly, that this was a contract not to be performed within a year, and that it has not been executed.

For the sake of the present argument, we admit that the contract sued on was not to be performed within a year; but we do insist that the complaint shows a performance. And on this point, we earnestly ask the Court to allow us a further hearing.

In the opinion of the Court, stress is laid on the fact that *Wilson* has done nothing towards performing his part of the contract; that his part was to pay the defendant a portion of the gain on the bonds; and that he has not parted with anything, &c.

What is the contract set up in the complaint?

It alleges that *Wilson* and one *Vance* had contracted with *The Indianapolis and Cincinnati Railroad Company* to do a large amount of work, &c., for which they were to receive compensation in bonds, at 75 cents; that in the prosecution of this work, it would be necessary to raise a large sum of money, to-wit, 300,000 dollars, and to raise this money, it was necessary to have drawers, acceptors, and indorsers; that *Vance* procured *Bates,* and *Wilson* procured Mr. *Ray* to draw, accept, and indorse, for the purpose of raising the funds needed in the prosecution of the work on the railroad. The agreement between *Wilson* and *Ray* was, that if the bonds should be sold for more than 75 cents, *Ray* should be entitled to one-half of the excess; but if for less, then he should make up one-half of the deficiency to *Wilson*.

Now, to test "what was to be performed" by each party, let us suppose the contract to have been in writing. What was *Wilson,* under such a contract, bound to do? Clearly, he was obliged to procure the railroad bonds mentioned in the contract—in other words, he was bound by his agreement with *Ray,* to fulfil his contract with the railroad company, so as to be able to furnish the bonds he was bound to furnish. In their agreement, they refer to that contract as subsisting, and the performance of the work therein specified, as the means by which *Wilson* was to procure the bonds. If *Wilson* had failed

to procure and furnish the bonds, is there any doubt but that *Ray* could have maintained an action for the breach of contract?

On the other hand, *Ray* was bound to draw, &c., such commercial paper as was necessary in doing the work on the railroad. If *Ray* had refused to draw, indorse, &c., could not *Wilson* have maintained an action against him for that refusal?

Now, this agreement was not in writing. One party could not compel a performance by the other, nor sue for a breach. But the contract is not void. The statute of frauds does not affect the contract; but only the remedy. The Courts will not lend their aid to enforce it. But it is voidable, at the option of either party. If either refuses to execute, the statute cuts off all remedy against him. But if the parties choose to execute, the statute will not prevent the execution. *Hadden* v. *Johnson*, 7 Ind. R. 397, and authorities cited.

If, then, the parties elect to perform the contract, and do perform it, what legal consequences flow from the performance? Clearly, the results which the parties had agreed should flow from it. We venture to say, that no adjudged case can be found, of respectable authority, in which it has been held, that after performance, the parties were not compelled to adjust their rights growing out of the performed contract, in accordance with their agreement.

But the complaint, in the case at bar, alleges that *Wilson* did perform the work on the railroad, and furnish the bonds, according to his contract; and that *Ray* did draw, indorse, and accept the necessary commercial paper. Was not this a performance by each party of what, by the contract, he was to do? Everything contracted to be done, by either party, was done. There only remained to strike the balance of profit or loss. This was the result or fruit of what had been done. It was not a thing to be performed; but a mode fixed by the parties themselves, for disposing of the results of what they had agreed to do, and had done in pursuance of that agreement.

Do no rights grow out of such a performacce? *Wilson* underwent all the toil and risks of performing his half of 300,000 dollars' worth of work on the railroad, in the belief that *Ray* would perform his undertaking, and that they would share the profits and losses mutually. *Ray*, also, in pursuance of his agreement, raised the necessary funds, and did all his obligation required on his part. If profits were the result of their joint, mutual labors, to whom did they belong? to him who first got his hands on them? If large profits had grown out of the transaction, and *Wilson* had got them in his possession, would *Ray* have been without remedy? If so, it must be because the Courts are powerless to decide upon the rights of parties growing out of their acts. Such a construction would enable a party to use the statute of frauds as a pretext to perpetrate frauds. Surely, when the parties to an agreement have both done all the acts, assumed all the liabilities and hazards, which, by the terms of their agreement, were contemplated as the basis for a division of the profits and losses, the Courts will not, at that point, interpose the statute of frauds, and enable one party to perpetrate the most enormous frauds on the other. Such an application of this principle would work great and numerous hardships. A large proportion of the daily transactions of the community are to be affected by it.

We insist that this case does not fall within the statute of frauds, because the contract was executed; and we submit that an opposite construction involves a mistake as to the essential character of the agreement. An analogy

seems to be drawn, both in the briefs of counsel and in the opinion of the Court, from a numerous class of cases cited, in which, for some article sold or service done, on one side, the other agrees to pay money. There the payment of the money is all that is contracted to be done on that side. Being the only thing agreed to be done, on the one side, the Courts hold very properly that there is no performance until the money is paid. But in this case, the payment of the money is not the thing contracted to be done. That is only a consequence to grow out of the acts agreed to be done by both parties. The acts agreed to be performed, were, on the part of *Wilson*, furnishing the bonds; on the part of *Ray*, indorsing, &c. This was done in accordance with the agreement. It was supposed, at the time, that profits would, and it was contemplated that losses might, result from the enterprise; but these profits or losses were results simply of the things contracted to be done. And all that is said about the payment of money by *Wilson* to *Ray*, or *Ray* to *Wilson*, is simply providing a rule for the decision of profits or losses, arising out of the work when done and completed on both sides.

We ask, also, for a new hearing, on the ground that the contract was one which, by its terms, might have been performed within a year. On this point, we refer the Court to *Artcher* v. *Zeh*, 5 Hill, 500; *Rake's adm'rs* v. *Pope*, 7 Ala. R. 171; *Cherry* v. *Heming*, 4 Exch. R. 631; *Moore* v. *Fox*, 10 Johns. 244.

We have cited no authorities on the first point, because we do not mean to dispute the law as laid down by the learned judge delivering the opinion; but only to contend that it has no application to the contract set up in the complaint.

(4) The following is an abridgement of the argument of Messrs. *Morrison, Ray,* and *O'Neal.*

There is no error in the case except against the appellee.

1. The demurrer to the complaint, we think, should have been sustained by the Court; and, as the proper exception was entered, to the overruling of that demurrer, we suppose that that question is still saved, and is properly before this Court. If we are right in this, and the complaint is bad, as not setting forth facts sufficient to constitute a cause of action, the judgment must be affirmed.

2. The Court committed no error in sustaining the demurrer of the defendant to the plaintiff's reply to the sixth paragraph of the answer, as we shall attempt to demonstrate presently; and if the Court should even hold that the sixth paragraph is bad, still the demurrer to it reaches back to the complaint.

We are aware that this Court, in *Johnson* v. *Stebbins*, 5 Ind. R. 364, and in *Gimbel* v. *Smidth*, 7 id. 627, ruled differently; but that was previous to the act of 1855 (p. 60), which amends the section upon which those decisions rest, so as to conform to the *New York* statute, and the *New York* decisions upon that statute. The amendment of the section being made in view of what this Court showed to be the difference between the two, it proves that the legislature of *Indiana* preferred the *New York* rule, which must, of course, be now considered the *Indiana* rule.

Our first proposition is, that the complaint is bad, because:

1. It shows the contract declared upon to be a gaming, or wagering contract.

*May Term,*
**1859.**

WILSON
v.
RAY.

2. That the contract, if regarded as one of insurance against loss on the sale of the bonds, is void, it not being averred to be in writing.

Is the contract a gaming or wagering contract?

A contract is defined by *Blackstone* (2 Comm. 446) "to be an agreement, upon sufficient consideration, to do or not to do a particular thing." By the civil law, which *Parsons*, in his work on contracts, says, is "logically exact and exhaustive;" considerations are divided into four species:

1. *Do ut des*, as when I give money or goods on a contract, that I shall be repaid money or goods again for them.

2. *Facio ut facias*, as when I agree with a man to do his work for him, if he will do mine for me; or, to do any other positive act on both sides.

3. *Facio ut des*, as when one agrees to perform anything for a price.

4. *Do ut facias*, as when I agree to give a servant wages for his work.

In every species of valid contracts, some act is to be performed or thing of value given, upon the return, or promise to return, an equivalent in valuables or labor. *Bouvier* and *Burrill* both define a wager to be, "A contract by which two parties, or more, agree that a certain sum of money, or other thing, shall be paid or delivered to one of them, on the happening or not happening of an uncertain event." See their Dictionaries.

The distinction, then, between a contract and a wager, is this: the contract is founded on a consideration, which passes from both parties to both parties. The wager is founded on a consideration, which, on the happening or not happening of an uncertain event, must all pass to one of the parties.

The agreement in the complaint set forth, then, is what?

If the stock market happened to be depressed, and the bonds sold at less than 75 cents, as was the case, the defendant is to lose half that sacrifice. Now what has he received to repay that loss? Nothing! Then it is not a legal contract. But, argues the complainant, he had his chance that the uncertain event would happen the other way, and then he would have received something. So, whether the defendant should receive anything or nothing, depended not on the value of his indorsement; but whether he should receive a profit or sustain a loss, depended simply on the happening or not happening of a future uncertain event. The stocks were owned by the plaintiff. He says to defendant, the chance of a rise in the stock market is greater than the chance of a decline, therefore, you pay me a premium—that is, indorse my paper, and you shall have the chance to receive half the amount of the rise in the price of stocks, for risking half the loss by a decline. It matters not whether the stake was half the profit or loss, or the whole profit or loss. The principle is the same. On the happening of the uncertain event, the stake was to be paid by plaintiff to defendant. On the not happening of that event, the stake was to be paid by the defendant to the plaintiff. This is a wager, according to all the authorities.

But the plaintiff says there was another consideration, to-wit, the defendant's indorsement for plaintiff. In other words, the defendant thought the chance for making money by the venture so much greater than the risk of loss, that he paid the plaintiff a *bonus* to get into the contract of wager. Now, what has the consideration or *bonus* to do with the contract itself? Evidently nothing. If two persons propose to wager 100 dollars, on the result of an election, and the chance is counted 10 per cent. better for the one than for the other,

and, therefore, the one pays the other 10 dollars as a *bonus* to induce him to make an even wager, does the amount so paid render the bet valid, so that the party paying the *bonus* can be compelled to pay the entire stake if he should lose the wager? The money paid as inducement to a contract, neither makes the contract itself legal or illegal. This we assume to be good law, as well as sound logic, and a full answer to the argument.

The consideration, and the only valid consideration, is paid by the party sought to be charged; and it will not do for the plaintiff to say, that although he never gave any consideration for the promise to which he seeks to hold the defendant, yet that the defendant has paid such a consideration; or, that because the plaintiff has received so much from the defendant for nothing, he is, therefore, entitled to claim a still larger sum.

*Parsons*, in his work on Contracts, vol. 1, p. 357, says, that "the fundamental distinction in the common law between valid considerations, are those cases where the consideration is a benefit to him who makes the promise, and those in which it is some injury to him who receives the promise." In these two divisions, he embraces all valuable or good considerations. Now, was the consideration which it is conceded the defendant paid, to-wit, his indorsement, of any benefit to him who promised to make good the plaintiff's loss—or was the defendant's indorsement any injury to the plaintiff? Neither. So, even if it could be shown that the indorsement by defendant of plaintiff's paper, was part of the consideration of the contract, still, as defendant only paid the consideration, and received nothing in return, he cannot be charged under this contract.

The indorsement by defendant, was manifestly a *bonus*, paid by him for the privilege of taking the chance of receiving half the profits, in consideration of risking the chance of half the loss.

The contract, then, is founded upon a consideration, which, by the "logically exact and exhaustive definitions of the civil law," and by the divisions of the common law, is illegal. It is a contract which fills every definition of a wager so fully, that it seems impossible to place it in any other category. A contract by which the question of who shall receive the profit, if there be a profit, or who shall pay the loss, if there be a loss, is not to be determined by any act performed by either party, or by any consideration paid by either party, but by "the happening or not happening of a future uncertain event." By the contract, the profit does not pass to the party who paid the consideration, if any was paid, but depends upon the uncertain event. This certainly fills the definition of a wager most fully.

But it was argued by the counsel for the plaintiff, that a wager was distinguished from a legal contract, in this: A wager was concerning a subject-matter in which neither of the parties had any interest; and that ownership or interest in the subject of the agreement, renders the contract legal. In the case of *Hall*·v. *Bergen*, 19 Barb. 126, JOHNSON, J., rendering the opinion of the Court, says:

"Though differently inclined upon the argument, a careful review and consideration of the provisions of the contract, and particularly that upon which the action is founded, have satisfied me entirely, that the referee was right in his conclusions, and that it is in the nature of a stake or wager, and consequently void by statute. The plaintiff paid 800 dollars for one-half of the animal, and after the contract, owned her as tenant in common ·with the de-

fendants. It is then provided, as part of the contract of sale, that the mare shall, on or before the 15th of *August* next, trot in harness, around the *Rochester Union Course*, in two minutes and thirty-four seconds; and in case she fails, or is unable to perform, that then the defendants shall deduct or pay back to the plaintiff, one-half of such sum as such failure may detract from the market value of said mare. The action is brought upon this provision to recover back, the complaint alleging a failure of the mare to perform, after repeated trials. Here a trial of speed is agreed upon, and the right of action rests solely on the failure of the animal, on such trial, to make the distance within the time. What is this but a race—a trotting match against time? Whether the plaintiff was entitled to anything or not, depends entirely upon the result of this trial of speed. And it is clear, I think, that this is nothing more nor less than a wager of an uncertain amount, under the guise and formality of a contract of sale. The contract is skilfully drawn, but the drapery does not conceal the vicious principle from careful observation. The case, in this respect, does not differ in principle from that of *Brogden* v. *Marriott*, 3 Bing. (N. C.) 88. * * * * * The provision in question is not a mere warranty of the capacity or qualities of the animal. It is more. It is an agreement to forfeit and repay the price advanced, or a portion of it, in case she fails to perform."

This decision fully answers the argument, that either party being interested in the subject-matter, will take the case out of the statute against wager and gaming. R. S. 1843, ch. 34, § 3.—1 R. S. ch. 45, § 1.

But we contend that the case cited establishes something more. A valuable consideration had been paid, as in the case before the Court, and yet that consideration did not make the contract good. In that case, the party paying the money or giving the valuable consideration, received something in return—an interest in the horse; but the plaintiff, *Wilson*, has given nothing in return for defendant's indorsement. In the one case, the determination of the question whether the party was entitled to anything or not, depended upon an uncertain event—the trial of speed. In the case under consideration, the same question was to be determined by an equally uncertain event—the rise or fall of the stock market. In the one case, the party who had given the valuable consideration, sued for a recovery upon the happening of the uncertain event. In this case, the party who has already received the valuable consideration, and given nothing therefor, sues upon the happening of the uncertain event. The principle is the same, and in neither case can a suit be sustained. The contract is void, as being a wager, and within the statutes cited.

But the contract was not only a wager, but one in which the plaintiff held the event on which defendant's liability depended, in his own hands; being at liberty to sell the bonds at any time, at any sacrifice, and still hold the defendant liable for the loss.

We refer the Court to a case in 45 Eng. Com. Law, 887, 4 Ad. and El. (N. S.) *Fisher* v. *Waltham*. That was a case where an attorney's clerk being about to pass his examination for admission to the practice of his profession, made a contract with one *B.* that if he, said clerk, should pass the examination and receive the certificate of his fitness, &c., he would pay certain articles to *B.*; but if said clerk should fail to receive said certificate, then said *B.* should pay the said articles to the said clerk. It was held by the Court, "that there was a fatal objection to the contract, namely, that one of the parties had the event

in his own hands." In that case, the suit was brought after the party who held the event in his own hands had passed his examination, and had thus lost his forfeit, showing that he had not used any undue advantage; and yet the Court allowed the other party to take advantage of this defect in the contract. Much more should the defendant have the advantage, when the party who thus held such an unconscionable power over him, brings his action to enforce a loss which may have resulted from this very advantage. The plaintiff owned these bonds, and he had the right to sell them when and to whom and for the price he pleased; he has done so, and now asks us to make good his loss. Certainly, it is a case where the principle laid down in *Fisher* v. *Waltham* will apply most strongly against the plaintiff.

But, if this is not a wager, if it is not void because the party who now seeks to enforce it, held the event on which depended our liability, in his own hands, let us see if it may be classed as a contract of insurance.

Insurance is defined by *Angell*, in his work on Insurance, § 3, to be "A contract by which one of the parties binds himself to the other, to pay him a sum of money, or otherwise indemnify him, in the case of the happening of a fortuitous event, provided for in a general or special manner in the contract, in consideration of the sum of money which the latter pays, or binds himself to pay to him."

"The party who takes upon himself the risk is called the insurer, and sometimes the underwriter, from the party subscribing his name at the foot of the policy; the party protected by the insurance is called the insured. The premium paid by the latter, and the peril assumed by the former, are two correlatives, inseparable from each other, and the union constitutes the essence of the contract." *Id.*, § 7. "Premium—The sum paid or agreed to be paid by an assured to the insurer, as the consideration for the insurance, being a certain rate per cent. on the amount insured." 1 Phil. on Ins. 205.—3 Kent's Comm. 253.—Burrill's Law Dict., tit. Premium.

Now, in this case, there is no premium paid, or agreed to be paid. If plaintiff lost, defendant agreed to make the loss good to a certain extent, for which he would receive nothing. There is no premium, and the essence of the contract is, therefore, wanting. We cannot, then, see how the contract can be classed as one of insurance.

And here we would say, that we do not class this as a wager policy. The Courts do hold, that where the contract is drawn in the form of a policy signed by the parties, and a premium paid, unless the party insured has an interest, the contract is a wager policy, and void. But here, the policy and the premium are wanting; and the contract can neither be a policy of insurance nor a wager policy, but simply a wager.

Although the agreement was one in which a consideration was not given and received by both parties, but was dependant upon the happening or not happening of an uncertain event, all the consideration passing to one party, yet if the Court consider it not a wager, and not void because one party held the event in his own hands, but a contract of insurance, then we insist that the contract must be in writing, and signed by the party to be charged, and must be so pleaded.

The case of *Cockerill* v. *The Cincinnati Mutual Insurance Co.*, 16 Ohio R. 148, decides the following points:

"A policy of insurance must be in writing.

"A verbal waiver of a forfeiture of a policy of insurance, is not binding.

"A verbal agreement that a policy which has been perfected by a transfer of the interest of the assured by judicial sale, that on repurchase by the assured, of the property originally insured, the policy shall re-attach and continue in force during the unexpired term, must, whether regarded as a waiver of a forfeiture, or a verbal policy, or an agreement to continue the old policy, to have any binding force, be in writing."

On the 163d and 164th pages of the opinion of the Court, the following language is used:

"1st. Is a verbal policy known to the law of insurance?

"Insurance is a branch of the law merchant, and its nature and principles spring from commercial usage, to which we are to look for the forms and mode in which it is reduced to practical action, in cases not determined by positive decision, or the rules of municipal law. The form of giving effect to the indemnity, is by a written instrument, containing the consideration, terms, and stipulations of the contract of indemnity between the underwriters and the insured, called a policy. It is universal commercial usage, that this policy shall be in writing, and there is no exception to it in positive decision, or municipal regulation. Such a thing as a verbal policy of insurance, is unknown to the law of insurance. All the books upon the subject, and decisions, unite in declaring that a policy must be in writing. And in every instance, where the municipal law has created and empowered corporations to enter upon the business of insurance, it has required that the contract of insurance, or the policy, must be in writing, and signed by the party to be bound. It is so in the act incorporating the insurance company now in question. To hold that there could be such a thing as a verbal policy, would be contrary to to all commercial usage, and the authority of all the books and decisions, and in this case, would be in opposition to the spirit and express requirement of the act of our legislature, creating the company.     *     *     *     *     *     *     *     *

*     *     *     *     *     *     But without the act, we should hold that a policy of insurance upon the principle of general usage must be in writing, as supported and declared by universal adjudication."

The plaintiff's counsel, however, insisted, that although a policy of insurance must be in writing, a contract of insurance need not be. In the case cited, the party having forfeited his policy, sought to recover on a verbal contract of insurance; and the Court held that there was no way of making a contract binding, except by reducing it to writing. This play upon words cannot avoid the effect of the decision.

But not only must a contract of insurance be in writing, but it must be so pleaded. In *Duppa* v. *Mayo*, 1 Saund. 276, note 2, is the following language:

"The difference is holden, that where a thing is originally made by act of parliament, and required to be in writing, it must be so pleaded, with all the circumstances required by the act, as in the case of a will of lands, to have been in writing. But where an act makes writing necessary to a matter where it was not so at common law, it is not necessary to plead the thing to be in writing, though it must be proved so on the trial. A lease for a longer term than three years, need not be pleaded to be in writing, but must be so proved, (2 Salk. 519, anon)." The lease for over three years need not be pleaded to be in writing, because it could have been verbal at common law; but we have seen that a policy or contract of insurance never could have been made except

in writing. In the above case (2 Salk. 519), it is held that where a statute created a new thing in writing, it must be so pleaded; but where it only adds it to a common-law matter, it need not. The contract of insurance, in its very origin, was required to be in writing, and, therefore, should have been so pleaded.

Still more strongly can we insist upon the objection, under our own statute, requiring all contracts to be set forth with the pleadings. This point we consider settled by this Court, in the case of *Resor* v. *Resor*, 9 Ind. R. 349, 350.

The plaintiff's counsel denied the contract to be a wager, and yet were unwilling to have it classed as a contract of insurance, although that was the original ground upon which they defended the contract; and they attempted to limit the subject-matter of insurance, to loss by fire, or marine insurance, or insurance upon life.

This position they assumed, after having themselves produced authorities, with which your Honors are familiar, that distinguish between wager policies of insurance (not simple wagers), upon the price of bonds, stocks, &c., and legal policies of insurance in writing, by the test of ownership in the bonds and stocks insured. In these cases, there existed both the premium paid, and the policy; and the Court regarded the subject-matter as within the protection of an insurance. The counsel for the plaintiff pointed to the test of ownership, as distinguishing a wager policy from a legal one, and not the subject-matter insured.

The counsel also claimed that the contract was one of partnership.

In 3 Kent's Comm., 5th ed., p. 24, partnership is defined to be "A contract of two or more persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit and bear the loss, in certain proportions."

Let the definition be applied to the facts, as shown by the plaintiff's complaint. It is not alleged that the defendant owned the bonds, or had any interest in them, as part owner. They were the sole property of the plaintiff, as he has said. The defendant had placed neither money, effects, labor, nor skill, in them. Nothing of the kind is averred. True, the defendant indorsed the plaintiff's paper, the plaintiff agreeing to give him one-half the profits upon their sale, for such indorsement, and the defendant agreeing to bear one-half the loss. Is there a single element of partnership in such an agreement? We can perceive none.

The contract was also called by counsel, a warranty. A warranty, is either a part of a contract of sale, or of a contract of insurance. In the latter case, it is made by the party insured, and must be in writing. Bouv. Dic.

But what was the consideration for the warranty, if it be such? They may call it what they please, but they must show a consideration.

It was also argued that a contingent consideration was good.

What is a contingent consideration?

We are at a loss here, for we find nothing of the kind in the books. The books define a contingency, to be an event that may or may not happen. Is it meant that an event that may or may not be a consideration, is good to support a contract? If so, we deny it. *Parsons* says a consideration must be something of value.

But the plaintiff says, as the defendant paid a good consideration, and could

have held the plaintiff to the agreement, therefore, the plaintiff can hold the defendant.

Now the law, as we understand it, is, that if the consideration is illegal, the contract is void. Was, then, the consideration legal, irrespective of the defendant's agreement to indorse? Was the chance consideration of risking a loss on stocks, against a profit on stocks, a legal consideration? Certainly not. Then the joining of a legal consideration with an illegal one, does not help the case. See 1 Parsons on Cont. 380; Story on Cont. §§ 458 to 461. In the case in 19 Barb., cited heretofore, the payment of 800 dollars failed to render the contract valid, even in favor of the party paying, and against the party receiving; and certainly, it cannot render valid an illegal claim against the party who has paid the consideration and received nothing therefor. But the indorsement was merely a *bonus* to enable the party to share the speculation. The contract was a risk of profit against a risk of loss, and illegal, as being a wager upon the price of stocks in the market.

The whole transaction may be paraphrased thus:

*Wilson*, the plaintiff, had a contract with the railroad company, by which he was to receive 350,000 dollars, in the bonds of the company, at 75 cents on the dollar. To enable him to carry out his contract, he is obliged to raise money on loan, and he must procure an indorser. He applies to *Ray*, the defendant, who consents to indorse for him, on the condition that he is paid for it. *Wilson* then proposes to give him one-half the profits that he may realize over 75 cents on the dollar; provided he, *Ray*, will indemnify him, *Wilson*, against one-half the loss he may sustain on such sale. The proposition was agreed to.

What is the consideration for the indemnity against such loss?

We respectfully submit, that for the reasons stated, the complaint is substantially bad; and that, therefore, the judgment of the Circuit Court should be affirmed.

The remaining question is, whether, or not, the Circuit Court erred in sustaining our demurrer to the plaintiff's reply to the sixth paragraph of the defendant's answer. We are fully convinced that the ruling, as to that, was correct.

The sixth paragraph of the answer, is a plea of the statute of frauds; and avers that the agreement and promise upon which the suit was brought, was not, by its terms, to be performed within one year from the time of making the same, and could not be performed within one year; and that said agreement was not in writing, signed by the defendant, nor by any person by him lawfully authorized, and so said agreement was and is void.

To this paragraph, the plaintiff, after filing a demurrer to it, which was overruled, filed the following reply: "That at the time of the making of the contract sued on, the defendant was a director of the railroad company named in the complaint, and was also cashier of the *State Bank of Indiana*, from which bank or some of its branches, it was then, by the parties to said contract, contemplated that the money (or a considerable part of it), to be raised under said contract, as stated in the complaint, should be borrowed. And the plaintiff alleges that the said defendant, for the fraudulent and wrongful purpose of concealing from said company, and from said bank and its branches, his said interest in said bonds, and his said contract, and his said connection with the

construction of said road, as stated in the complaint, specially requested the plaintiff that the contract herein sued on should not be reduced to writing, and signed by said defendant, and that for said cause alone, and on said request only, said contract was not reduced to writing and signed by the defendant. Of which fraudulent and wrongful purpose the plaintiff was then ignorant."

To this novel evasion of the plea of the statute, the defendant filed a demurrer, "Because said reply does not state facts sufficient to constitute a cause of action against the defendant; showing the following causes of demurrer, viz.:

1. That said reply merely alleges a reason for not making the said supposed contract, in writing.

2. That said reply is merely an attempted slander of the defendant, and that under cover of a regular pleading in Court.

*Parsons*, in his treatise on Mercantile Law, p. 71, says: "The statute of frauds, so called, was passed in the twenty-ninth year of *Charles* II., 1677, for the purpose of preventing frauds and perjuries, by requiring, in many cases, written evidence of a contract." In the same author's treatise on the Law of Contracts, vol. 2, 2d ed., pp. 285, 286, the following language is employed: "It is obvious, that the most general purpose of these sections is to permit no party to bind himself, except by a written promise signed by him; because this will secure an exact statement, and the best evidence of the terms and conditions of the promise."

We are informed, however, by formal pleading by able counsel, that on a contract upon which our statute says, "No suit shall be brought, unless the contract," &c., "shall be in writing, signed by the party to be charged," a suit may be brought, and the express prohibition of the statute nullified, by an allegation that the party refused to sign a written agreement on the subject.

The plea alleges fraud in the defendant, in failing to make a legal contract; and he is sued for not making a legal contract.

The statute is positive, that the agreement, to be valid, shall be reduced to writing, and signed by the party to be charged.

The reply admits that the contract was not reduced to writing; but it does more; it avers that the mind of one of the parties never contemplated or consented that the agreement should be reduced to writing. It admits not only that the legal evidence of a contract is wanting; but, in effect, admits also that the contract itself was never made, because it admits that it was never evidenced in the only mode that such contracts must be evidenced.

There was no legal obligation on either party, requiring him to consent to have it put in writing; and for whatever reason he may have declined, that reason could be no fraud on the other party. What wrong is done one party by the refusal of the other party to put an agreement in writing, unless relying upon the agreement, something is done in pursuance of it, that raises an equity in his favor that entitles him to relief?

But the reply does not allege our intention to commit a fraud upon the plaintiff; but that for the wrongful and fraudulent purpose of concealing the agreement from strangers, the "defendant requested the plaintiff that the contract should not be reduced to writing, and signed by the defendant." What power or right had the plaintiff "to have the contract reduced to writing and signed by the defendant," that he should be requested by defendant not to do so? And how is it, that the plaintiff can predicate a right of action for a fraud not practiced upon him, but upon parties in nowise connected with the trans-

action, and for which they have neither complained, nor authorized the plaintiff to complain? Nor does the reply show any damage sustained by the plaintiff, nor by the parties from whom the alleged fraudulent concealment was made. The reply is no answer to the statute of frauds. Our own opinion of its character is most candidly expressed in our second special cause of demurrer, viz., that it is merely an attempted slander of the defendant, and that under cover of a regular pleading in Court.

We understand the principle to be, that if, by the express or specific agreement of the parties, or if it appear to have been understood by the parties, that the contract would not be performed within a year from the time of making the agreement, then the contract is void, as being within the prohibition of the statute of frauds.

The plaintiff's counsel have assumed the law to be, that it must be expressly stipulated in the contract, that it is not to be performed within a year. To sustain this position they refer to the dictum of the judge, in *Wiggins* v. *Keizer*, 6 Ind. R. 254. The point decided there was, that a promise to pay for the future support of a child, is not within the statute of frauds; because it might, or might not, upon a contingency, be performed within a year; and the Court refers to *Fenton* v. *Emblers*, 3 Burr. 1278; *Moore* v. *Fox*, 10 Johns. 244. It has been held by several authorities, that the promise to support a child, is not within the statute of frauds. The decision is right; but the language of Judge GOOKINS, in *Wiggins* v. *Keizer*, is not sustained by the weight of authority. In *Moore* v. *Fox*, 10 Johns. 244, the Court say: "There must be an express and specific agreement not to be performed within the space of a year," &c. But they do not say, the express stipulation of the parties must be, not to perform the agreement within the year. They held the contract valid, for it did not appear but that it was to be performed within a year; and the presumption was, that it would be performed in a half year."

In *Boydell* v. *Drummond*, 11 East. 142, it appeared that one party to the contract was to publish and deliver certain large prints from scenes in *Shakspeare's* plays, two to be delivered at the time of subscribing, and the others, at least one annually, after delivery of the first. The Court held, "that if it appears to have been the understanding of the parties to a contract, at the time, that it was not to be completed within a year, though it might, and was in fact in part performed within that time, it is within the fourth clause of the statute of frauds (29 Car. II., c. 3), and cannot be enforced unless in writing." In that case, the attorney general and other counsel had called the attention of the judges to the very case cited by this Court (*Fenton* v. *Emblers, supra*). And BAYLEY, J., with that case before him, said: "The cases have decided that in order to bring a contract within this branch of the statute, it must either have been expressly stipulated, or it must appear to have been the understanding of the parties, that it was not to be performed within a year. That does appear in the present case; and I cannot say that a contract is performed, when a great part remains unperformed; or, in other words, that part performance is performance."

The case of *Peters* v. *Westborough*, 19 Pick. 364, was a contract like the case in 6 Ind. R., for the support of a person, and was held not within the statute, because its performance depended upon a contingency, the death of the party; and WILDE, J., after reviewing the cases, including the case in 3 Burr., *supra*, and also in 11 East, *supra*, said: "From these authorities it appears to be set-

tled, that in order to bring a parol agreement within the statute of frauds, it must either have been expressly stipulated by the parties, or it must have been so understood by them, that the agreement was not to be performed within a year."

In the case of *Herrin* v. *Butters*, 20 Maine R. 119, the Court say:

"Where, by the terms of a contract, the time of its performance was to be extended beyond a year, it is within the statute of frauds, though a part of it was, by the agreement, to be performed within a year.

"To bring a case within the statute of frauds, it must have been expressly stipulated by the parties, or it must, upon a reasonable construction of their contract, appear to have been understood by them, that the contract was not to be performed within a year."

At p. 122, WHITMAN, C. J., said: "It is urged that the defendant might have cleared up the land and have seeded it down in one year, and thereby have performed his contract. This may have been within the range of possibility, but whether so or not, must depend upon a number of facts, of which the Court are uninformed. This, however, is not a legitimate inquiry, under this contract. We are not to inquire what, by possibility, the defendant might have done, by way of fulfilling his contract. We must look to the contract itself, and see what he was bound to do; and what, according to the terms of the contract, it was the understanding that he should do. Was it the understanding and intention of the parties, that the contract might be performed within one year? If not, the case is clearly with the defendant. But the contract is an entirety, and all parts of it must be taken into view together, in order to a perfect understanding of its extent and meaning. We must not only look at what the defendant had undertaken to do, but also to the consideration inducing him to enter into the agreement. The one is as necessary a part of the contract as the other, and if either, in a contract wholly executory, were not to be performed in one year, it would be within the statute of frauds. Here the defendant was not to avail himself of the consideration for his engagement, except by a receipt of the annual profits of the land as they might accrue for the term of three years. But whether this be so or not, it is impossible to doubt that the parties to the contract perfectly well understood and contemplated that it was to extend into the third year for its performance, both on the part of the defendant and plaintiff. Its terms most clearly indicate as much, and by them it must be interpreted."

In the case of *Moore* v. *Fox*, 10 Johns. 244, the Court say: "To bring the case within the statute, it must appear to be an express and specific agreement that the contract is not to be performed within one year,"—and cite the case of *Fenton* v. *Emblers*, 3 Burr., *supra*, where the same language is used by the Court. But in the case of *Boydell* v. *Drummond*, 11 East, *supra*, in which there was no express or specific agreement that the contract should not be performed within a year, the Court say that, "the whole scope of the undertaking shows that it was not to be performed within a year, and was, therefore, within the statute." This seems to show very clearly what is to be understood by an express or specific agreement, that a contract is not to be performed within a year. In the case of *Peters* v. *Westborough*, 19 Pick. 364, Mr. Justice WILDE, in delivering the opinion of the Court, says: "It must have been expressly stipulated by the parties, or it must appear to have been so understood by them, that the agreement was not to be performed within a year." But who

can doubt what the express and specific understanding of the parties in the case at bar was? and that it was not to be performed within one year? or, at any rate, that it appears to have been so understood by them?

In *Bull* v. *McCrea*, 8 B. Mon. 422, Chief Justice MARSHALL, in delivering the opinion of the Court, holds the following language: "We cannot, however, on the face of the declaration, say that the promise to support the plaintiff during her life, was necessarily one which was not to be performed within a year, or that in the contemplation and by the express intention of the parties, it was not to be performed completely within that period." Here the doctrine for which we contend is recognized, that the time within which the parties contemplate and intend the contract shall be performed, must be regarded in determining whether the contract is, or is not, within the statute of frauds.

In *Hinkley* v. *Southgate*, 11 Verm. R. 429, REDFIELD, J., in the opinion, says: "It is, indeed, not true, that every contract which shall happen not to be performed within the year from the making thereof, is within the statute. If the time of the performance depend upon a contingency, which may reasonably be expected to happen within the year, the contract is not required to be in writing. If the contract be to pay so much money on the return of a ship, which ship happened to return within two years, the case was held not within the statute. *Anonymous*, 1 Salk. 280."

In *Fenton* v. *Emblers*, 3 Burr. 1278, DENISON, J., says: "The statute only extends to those cases which are 'specifically agreed not to be performed within the year.' It is doubtless true, that the statute does not extend to any case where the time of performance is uncertain, but is expected to come, or may probably come, within one year. In such a case, the parties might be said to act in good faith, in relation to the requisites of the statute, in not reducing the contract to writing. But where the contract is not expected to be performed within the year, but depends upon a contingency, which may, by mere possibility, occur within the year, it would seem but a reasonable strictness of construction to require the contract to be reduced to writing." Such was, in effect, the case of *Boydell* v. *Drummond*, 11 East, 142.

In 2 Parsons on Cont., 2d ed., p. 316, note (y), the author reviews the cases which have arisen upon this clause of the statute of frauds. We offer no apology for citing this work, though merely a text-book, because the author has a reputation second to few other living commentators.

The cases are divided by the author into three classes:

"1st. Where, by the express agreement of the parties, the performance of the contract is not to be completed within the year." This he holds as clearly within the statute.

"2d. Where it is evident, from the subject-matter of the contract, that the parties had in contemplation a longer period than one year as the time for its performance.

"3d. Where the time for the performance of the contract is made to depend upon some contingency, which may or may not happen within one year." Which latter is held not to be within the statute.

He says, in regard to the second class (on pp. 317, 318), that of "those cases where it is evident from the subject-matter of the contract, that the parties had in contemplation a longer period than one year as the time for its performance, although there is no express agreement to that effect, there has been more doubt, but it is now settled that they are within the statute."

We think there can be no question as to the correctness of the above conclusions, after a careful and critical review of the authorities. Nor do they conflict with the principle upon which the case in 6 Ind. R. was decided; that case clearly falling within the third division.

The Court will observe, that in *Herrin* v. *Butters*, 20 Maine R. *ante*, the learned judge has inadvertently cited the case of *Moore* v. *Fox*, 10 Johns. 243 (referred to in *Wiggins* v. *Keizer*, 6 Ind. R. 252), as using the following language: "To bring the case within the statute, it must appear to be an express and specific agreement that the contract is not to be performed within one year;" while the language used in that case is the following: "There must be an express and specific agreement not to be performed within the space of one year." The words, "that the contract is," are not in the *New York* decision; and we think they are a material interpolation, entirely changing the sense, which seems to have been carried into the citation of the same case in 6 Ind. R., *ante*.

In *Moore* v. *Fox*, the Court say: "The presumption was that the promise was to be performed half yearly." Is this case to be relied on, when the Courts of the same state have intimated that the contingency referred to is within the statute? The very cases in *Johnson* and in *Burrows*, as we have shown, have been commented upon and explained repeatedly, to mean that the time contemplated and intended for the performance of the contract, must determine the contract to be within or not within the statute.

What then, in the contemplation and intention of the parties, was the time fixed for the complete and full performance of this contract? By the contract between the plaintiff, *Lawrence M. Vance*, and the *Indianapolis and Cincinnati Railroad Company*, made *January* 31, 1852, it was agreed that the work should be completed by the 1st of *October*, 1853; and that within ten days after notice of completion, the bonds were all to be delivered to the plaintiff and *Vance.* That contract is referred to in the contract upon which this suit is founded, and made a part of it. The parties, then, had a period of twenty months for the completion of the railroad and delivery of the bonds. The contract sued on, was made *June* 15, 1852; about fifteen months and a half before the time limited for the completion of the road. It is a matter of public notoriety, and a part of the current history of the times, that railroad corporations make their contracts with the view of accomplishing a completion of their roads at the earliest practicable moment; and it is equally notorious, that no western railroad was ever yet completed within the time contracted for. The parties, then, with the railroad contract before them, which fixed the time for the completion of the road and the receiving of the bonds, which could not be sold till long after the lapse of a year from the time of the making of this contract, made the agreement regarding the disposition of those bonds. Can the Court say that it was not the intention and expectation of the parties, that the contract should extend beyond one year? Or can it assume that a contingency existed, by which the contract could be performed in less than the time fixed?

*Webster* defines "contingent" to be "a fortuitous event—that which comes without our design, or foresight, or expectation." Contingency—"to happen to," "to fall to."

Browne on the Statute of Frauds, § 283, says—"Physical possibility is not what is meant, when it is said that if the verbal contract may be performed within the year, it is binding."

If this contract could be completed within the year, it would not be by the happening of a fortuitous event, or without design, but by design and the labor and skill of the contractors. Its completion did not depend upon a contingency; and the parties have shown their intention and expectation, and have expressed their judgment, as to the time required to complete the contract. On this point, we will refer again to the opinion of the Court, in *Herrin* v. *Butters*, 20 Maine R. 119. WHITMAN, Chief Justice, said: "It is urged that the defendant might have cleared up the land and have seeded it down in one year, and thereby have performed *his* contract. This may have been within the range of possibility, but whether so or not, must depend upon a number of facts of which the Court are uninformed. This, however, is not a legitimate inquiry under this contract. We are not to inquire what, by possibility, the defendant might have done, by way of fulfilling his contract. We must look to the contract itself and see what he was bound to do, and what, according to the terms of the contract, it was the understanding that he should do." The plaintiff in this suit "was bound" to complete the railroad contract by the 1st of *October*, 1853; and was to receive the bonds within ten days afterwards; and this was understood by the contract of the present parties; and as the bonds were not to be delivered to the plaintiff until after completion, the parties could not intend nor expect to claim the benefits of this contract until after the full completion of the railroad contract. If, then, the intention and understanding of the parties is to govern, the contract was not to be performed within the year.

But it is not simply upon the intention of the parties that we rely. We have pleaded the agreement to be an "express and specific contract, not to be performed within the year." We have averred that by the terms and stipulations of the railroad contract, as well as by the terms and stipulations and recitals of the contract upon which the suit is brought, "the said plaintiff and said *Vance* bound and obliged themselves to hold the said bonds, and to keep them out of the money market, and not to sell nor finally dispose of them for the whole period of, and until the expiration of sixteen months from the 1st day of *April*, 1852." The contract was for the equal division of advance or loss on the final disposal of said bonds. Then, the contract could not be performed by the express and specific agreement of the parties, until after the 1st of *August*, 1853, more than a year from the date of the contract.

The plaintiff urged, that as the railroad company reserved the right to receive back from said *Vance* and *Wilson*, the whole or any part of said bonds, by paying 85 cents for them, any time within said sixteen months, or by giving stock for them at par, the reservation takes the contract out of the statute. But this receiving them back, was evidently not the "final disposal" on which a dividend was to be made; for the parties were bound not to make such "final disposal" or sale of them in the money market during such period, unless by the mutual consent of all the parties. Evidently, the final disposal contemplated was the sale in the money market, after the time limited had expired. The parties contracted not to finally dispose of them for sixteen months, and then agreed to divide the advance or loss on such final disposal. The right of the railroad company to receive back the bonds, and pay off the contractors in money or stock, would have simply terminated the subsequent contract, and not have performed it. But the contract is still more explicit as to the meaning of the term "final disposal." The railroad company had the right to re-

ceive back the bonds without the consent of the contractors, *Vance* and *Wilson*, and without the consent of the defendant; but the contract says expressly, that the final disposal contemplated before the adjustment of profit or loss, should only be made on the mutual, concurrent disposal of said *Vance, Wilson, Hervey Bates*, and the defendant. Clearly, then, a reception back by the railroad company, of these bonds, without regard to the consent of the four parties above mentioned, was not the final disposal contemplated; and the possibility that the company might thus terminate the contract without regard to the wishes of the parties, does not take the case out of the statute. In the case of *Burch* v. *The Earl of Liverpool*, 9 Barn. and Cress. 392, it was held, that a contract whereby a coachmaker agreed to let a carriage for a term of five years, in consideration of receiving an annual payment for the use of it, but which, by the custom of the trade, is determinable at any time within that period, upon the payment of a year's hire, is an agreement not to be performed within a year, within the meaning of the statute of frauds, and, therefore, must be signed by the party to be charged therewith. BAYLEY, J., says: "Assuming that the custom proved is to be considered as part of the contract, still the contract was in its terms an agreement for five years, determinable by the parties within that period. It was, in the very terms of it, an agreement not to be performed within a year."

In the case of *Harris* v. *Porter*, 2 Harring. 27, the Court held that, "A contract which, by its terms, is to continue longer than a year, is within the statute of frauds, and must be proved by writing, although it may possibly be put an end to within the year." That was an action for the violation of a contract in relation to carrying the mail.

The defendant had a contract with the Postmaster General to carry the mail from *Newcastle* to *Georgetown*, from *January* 1, 1832 to *December* 31, 1835. The plaintiff took a sub-contract to carry it a part of this distance, from *Camden* to *Milford*, from *April* 1, 1832, for the residue of *Porter's* term. On the 1st of *October*, 1832, the defendant dismissed *Harris*, and himself put on stages for the whole route. The agreement between them was merely verbal. The defendant moved a non-suit, on the ground that the contract was within the statute of frauds. It was answered by plaintiff's counsel, "That the contract between *Porter* and the Postmaster General, reserved to the latter the power to alter the route, and thus put an end to it at any time whatever; it might, therefore, be terminated within the year; and did not necessarily reach beyond it. Such a contract does not come within the act, which was made to meet agreements the performance of which was necessarily to be postponed beyond the year. 1 Com. on Cont. 79, &c.—3 Burr. 1278. Contracts depending on a contingency are not within the statue. If the agreement may be performed within the year, it is not within the statute. 10 Johns. 254."

But the Court said: "This was a contract which could not possibly be performed within one year; by its terms, it was to continue four years. And though it might be annulled or put an end to by the Postmaster General, within the year, it still falls within the act, as an agreement which, according to its terms, is not to be performed within the space of one year."

We think the decision is applicable to the case before the Court. The defendant was to be liable, by the terms of the contract, for the loss upon the final disposal of the bonds, which disposal was to be made only on the concurrent disposal of *Bates, Ray, Wilson,* and *Vance*. They were to be held some

fifteen months before they could be thus finally disposed of; and the fact that the railroad company could redeem them within that time, against the will of all parties, and thus terminate the contract, did not render the contract capable of full performance within the year.

But we have also alleged "that the contract could not be performed within the year." This would raise an issue of fact, if the question is not to be determined alone by the agreement. In the case, cited above, of *Burch* v. *The Earl of Liverpool*, 9 Barn. and Cress. 392, the Court received evidence of the custom of the trade, to determine the contract of the parties. In *Clark* v. *Pendleton*, 20 Conn. R. 495, the Court say: "It is unnecessary for us to determine what would be the effect of proof that the event upon which the performance of a verbal contract depended, could not by possibility take place within a year from the making thereof, when it did not appear from the contract itself that it was not to be performed within that time, because there was no claim in the present case, that raised that point."

We do not know that any Court has settled this point. We do not press it, because we believe this case to be one where, by the terms of the contract, and by the intention and expectation of the parties, its performance was to extend beyond the year. It has been so held, after a most careful examination by his Honor Judge MAJOR, and we cannot doubt that your Honors will view the contract in the same light. But if not, we submit that our plea puts the possibility of performance in issue, and to sustain the demurrer, the Court must hold that evidence outside of the contract, going to show that from the situation of the parties, and the subject-matter of the contract, or other circumstances, it could not be performed within the year, must be excluded.

Upon the petition for a rehearing, Messrs. *Morrison, Ray*, and *O'Neal* submitted the following brief:

The petitioner, represented now by an array of distinguished names, other than those, no less distinguished, who fought the case to what was, until a few days ago, understood by us to be a final decision, has presented, and earnestly pressed upon the special attention of your Honors, a proposition which they insist should determine the case in their favor, to-wit, that the contract sued upon was "so far executed as to take it out of the statute."

While we emphatically deny that assumption, we concede the following propositions:

1. "Where the contract has been, in fact, completely executed on both sides, the rights, duties, and obligations of the parties, resulting from such performance, stand unaffected by the statute." Browne on Stat. of Frauds, p. 118, § 116.

2. "Where a verbal contract is completely executed by one party, the consideration can be recovered from the other, notwithstanding the statute of frauds." *Id.*, p. 119, § 117.

Whilst, however, we make these concessions, there are other propositions equally plain and authoritative, that, when applied to the case, must overrule the motion for a rehearing.

In discussing the assumption of the petitioner, we feel it to be almost impossible to do so without a repetition, in our own way, of many things that have been much better said in the unanswerable opinion already delivered; and our apology for saying anything further on the subject is, that we do so

merely in compliance with the request of our client; for we have the most implicit faith in the perfect correctness of the decision already pronounced, which, and without any flattery we say it, was, at the time, received by the bar with unqualified approbation.

As preliminary to the principal question presented for a rehearing, we submit that the complaint is bad, because it does not aver and show "such acts of part execution, or other equitable circumstances as would justify the Court in enforcing it." Browne on Stat. of Frauds, p. 484, § 511. We suppose that, under our present practice, law and equity distinctions being abolished, and all material facts being required to be stated, both in the complaint and answer, the complaint should show, either that the contract sued on was in writing, or "such acts of part execution, or other equitable circumstances as would justify the Court in enforcing it." It is not alleged that the contract was in writing; and we insist there are no proper averments showing any such act of part execution, or other equitable circumstance, as the rule requires.

We demurred to the complaint. Our demurrer was overruled, and we excepted. We then answered. *Wilson* demurred to the answer. This demurrer reached back to the complaint; and if that was bad, the decision was right in our favor, even if the answer was bad, which, however, we do not admit, and which answer this Court have already adjudged to be sufficient.

There is no act or equitable circumstance alleged in the complaint that, according to settled authorities, will take the case out of the statute.

*Maddocks*, in his Treatise on Chancery, vol. 1, p. 301, says: "If, therefore, it be clearly shown what the agreement was, and that it has been partly performed—that is, that an act has been done, not a mere voluntary act, or merely introductory or ancillary to the agreement, but a part execution of the substance of the agreement, and which would not have been done unless on account of the agreement; an act, in short, unequivocally referring to, and resulting from the agreement, and such that the party would suffer an injury amounting to fraud, by the refusal to execute that agreement; in such case, the agreement will be decreed to be specifically performed." See, also, 2 Br. Ch. Cases, 140; 1 *id*. 412; 3 Atk. 4; 2 Anstr. 424; Ambl. 586; 1 Sch. and Lef. 41; 14 Ves. 386.

The rule is quoted and acted upon in *Caldwell* v. *Carrington's Heirs*, 9 Pet. 86.

Again, in *Phillips* v. *Thompson*, 1 Johns. Ch. 132, Chancellor KENT uses the following language: "It is not enough that the act is evidence of some agreement, but it must be unequivocal and satisfactory evidence of the particular agreement charged in the bill." "Such an act," to use Lord HARDWICKE'S words, "as could be done with no other view or design than to perform the agreement." See, also, 1 Md. Ch. Dec. 345; 4 Md. R. 459; 1 Hare, 26; *Frame* v. *Dawson*, 14 Ves. 386; 7 *id*. 341; 2 Sch. and Lef. 1; 2 Cox, 271; 1 Coll. Ch. 624; 1 Swanst. 172; 2 Dru. and War. 349; 6 Ves. 12; 6 Barb. (N. Y.) 98; 15 Conn. R. 406; 19 *id*. 74; 19 Penn. R. (7 Harr.) 461; 3 *id*. 332; 7 Barr. (Penn.) 91; 11 Gill and Johns. 314; 1 Md. Ch. 244; 8 Gill, 337; 9 *id*. 32; 2 McCord Ch. (S. C.) 274; 2 Overton, 192; 11 Ohio R. 265; 3 Gill and Johns. 127.

Now, what acts or circumstances are shown in the complaint?

It is alleged that the plaintiff and one *Vance* made an agreement with a railroad company to furnish materials, and do a large amount of work, for

which they were to receive, and did receive, a large amount of bonds, to-wit, 350,000 dollars. The complaint then proceeds as follows: "The plaintiff further says, that, in order to raise the money first aforesaid, it became necessary to borrow the same by the execution of commercial paper, from time to time, as the same might be needed, with good indorsers, in view of which necessity the said *Vance* procured one *Hervey Bates* as his indorser, acceptor, and drawer on said commercial paper, on terms then agreed upon between them; and the plaintiff, in order to procure an acceptor, drawer, and indorser, also, as aforesaid, then and there entered into the following agreement with the defendant: The plaintiff then and there promised the defendant, that if the defendant would draw, accept, and indorse said commercial paper, as the same might be, from time to time, needed, along with said *Bates*, the plaintiff would pay to said defendant one-half of the amount which the plaintiff should realize on said bonds, over and above 75 cents on the dollar of said bonds— provided, that if on said bonds he should not realize 75 cents on the dollar on disposal of them, the defendant should pay to the plaintiff one-half the loss sustained by the plaintiff, by reason of such disposal of them under 75 cents on the dollar; and defendant, then and there, in consideration of said promise by the plaintiff, promised," &c.

The complaint proceeds to allege that the defendant did draw, indorse, and accept as aforesaid, and that a loss did occur. The distinguished counsel who controlled this case until it was decided, failed to show any act of part performance by the plaintiff, to take it out of the statute. This learned Court failed to discover any such act; and if any such act has been pleaded, the present counsel are entitled to the credit of its discovery. The new discovery is, that the plaintiff and *Vance* did perform the work they had contracted with the railroad company to perform. That may or may not be true, though it is not so alleged in the complaint. Indeed, the complaint pleads the contract with the railroad company, and the delivery of the bonds to *Wilson* and *Vance*, as if it preceded the contract with the defendant. But, at all events, the complaint shows, that by the contract with the railroad company, *Wilson* and *Vance* were jointly obliged to perform the work and receive the bonds; and the fact that they did so, in compliance with their own solemn obligations to the railroad company, does not fill the requirement "that the act must be one which would not have been done, unless on account of this contract" between *Wilson* and defendant. Is this such an act, to use Lord HARDWICKE's words, "as could be done with no other view or design than to perform this agreement?" In *Johnston* v. *Glancy*, 4 Blackf. 98, the Court say: "But even these acts of part performance must be done with a direct view of the agreement being performed, and be such acts as could be done with no other view, or the agreement will not be taken out of the statute."

"But an act which, though done in pursuance of a contract, admits of explanation without supposing a contract, is not, in general, admitted to constitute an act of part performance to take the case out of the statute of frauds." Browne on Stat. of Frauds, § 455. The complaint itself shows that the act relied upon was done in pursuance of a contract between other parties. It certainly can be explained without presuming a contract between *Wilson* and defendant.

Justice STORY says: "In order to make the acts such as a Court of equity will deem part performance of an agreement within the statute, it is essential

that they should clearly appear to be done solely with a view to the agreement being performed. For if they are acts that might have been done with other views, they will not take the case out of the statute, since they cannot properly be said to be done by way of part performance of the agreement." 2 Story's Eq. Juris., § 762. Apply this rule to the act of performance claimed by the plaintiff.

The case of *Jacobs* v. *The Petersborough, &c., Railroad Co.,* 8 Cush. 223, was one where the owner of land, through which a railroad corporation were authorized to make their road, gave them a bond to convey to them by a certain day, on payment of a specified sum of money, so much of his land as should be taken by them by authority of law for the purposes of their road; and the corporation, within the time allowed by law, entered upon and took the land for the purposes of their road; but on the owner's tendering them, on the day named in the bond, a deed of the land so taken, the company refused to pay him the stipulated sum of money. It was *held,* "that the agreement, not having been signed by the corporation, could not be specifically enforced against the corporation in equity." The Court say: "In the first place, it does not appear that the defendants took possession of the land under the contract. They had the right, under their acts of incorporation, and the general statutes of the commonwealth, to enter upon the land of the plaintiff, and construct their road over it, without any contract, and even against the consent of the owner. For aught that appears in this case, all the acts of the defendants, relied upon as showing part performance of the contract, were done under the rights and powers conferred on them by statute, and not in pursuance of the contract. If the acts done are equivocal in their nature, or susceptible of a double interpretation, a Court of equity will not interfere on the ground of part performance."

In the case cited, the railroad company could enter upon the land either under their charter or under the contract. But in the case now before the Court, the plaintiff was bound, by a contract with another party, as stated in his complaint, to perform this very work, and receive these bonds in payment for that work. It cannot, then, be said, in the language of the authority in 4 Blackf. *supra,* that the work was done by the plaintiff "with a direct view of this agreement (with defendant) being performed, and was such an act as could be done with no other view." The complaint, in stating the contract between the plaintiff and *Vance,* and the railroad company, have precluded any presumption of the work being performed in execution of the contract with the defendant, even if presumption could be regarded in such a case. But the fact that the performance of the work and receiving of the bonds were by *Wilson* and *Vance* jointly, fixes the fact, beyond all question, that the performance alleged in the argument of the counsel, was under the joint contract of *Wilson* and *Vance* with the railroad company, and not under the separate contract between *Wilson* and the defendant. The work done was not performed by *Wilson,* but by the firm of *Wilson* and *Vance.* This defendant had no connection with that firm, nor with the contract between them and the railroad company, by which they were required to perform that work and receive the bonds.

This Court, in discussing the point of performance, use the following language:

"The first proposition, we think, is not true in point of fact. We do not regard the contract as being executed, but as executory in its character. The promises were mutual, and dependent one upon the other for a consideration. The plaintiff, in consideration of the defendant's promise, promised the defendant one-half of what he should realize on the bonds over 75 cents on the dollar; and the defendant, in consideration of the plaintiff's promise, promised to become drawer, acceptor, indorser, &c., for the plaintiff, and to make up to the plaintiff one-half of the loss on the bonds, should they not bring the 75 cents on the dollar. The contract, when made, was purely executory. No consideration passed from one to the other. The consideration of the promise of each was the promise of the other."

This is certainly the true view of the contract; and in this view, *Wilson* has done nothing; and the assumption that *Ray* could have enforced the contract against *Wilson*, can only be true because *Ray* had, in part, performed; and the argument that, therefore, *Wilson* can sustain the action against *Ray*, proceeds upon the ground that part performance by defendant takes the case out of the statute, which is not the law. The authorities all concur in establishing the position that the part performance which would entitle a party to enforce such a contract, must proceed from himself. See Browne on Stat. of Frauds, § 453, and authorities cited; *Rathbone* v. *Rathbone*, 6 Barb. 98.

Again, *Story*, in his Equity Jurisprudence, vol. 2, § 761, says: "But a more general ground, and that which ought to be the governing rule in cases of this sort, is, that nothing is to be considered part performance which does not put the party into a situation which is a fraud upon him, unless the agreement is fully performed." Can it be insisted that *Wilson*, in fulfilling the terms of his joint contract with *Vance* and the railroad company, has done any act which he could avoid doing under that contract? And could the defendant defraud him by inducing him to do an act that the law would have compelled him to perform? This answers the argument of the petition, even if we admit that *Wilson* had performed the work under his contract with the defendant.

But if the petitioner could be permitted to contradict his complaint, and insist, as he attempts to do, that the defendant's promise to be responsible for loss, was not in consideration of the plaintiff's promise to pay him one-half of the profit on the bonds as alleged in the complaint, but was in consideration of performing the work for the railroad company, and that the work had been performed, still it would not save this case from the statute. The rule of law is as follows (we quote from 1 Smith's Lead. Cas., p. 437): "But it has been generally held in this country, that as the statute was meant to provide against the danger of allowing contracts to be proved by parol evidence, at periods remote from those at which they were made, it applies to all cases where the obligation or duty sought to be enforced could not have been fulfilled within a year from its date; and that an oral promise for the payment of money, or the performance of any other act, at a greater distance of time than a year, is consequently invalid, whether made upon an executed or executory consideration." See *Cabot* v. *Haskins*, 3 Pick. 83; *Holbrook* v. *Armstrong*, 1 Fair. 30; *Lockwood* v. *Barnes*, 3 Hill, 128. In *Boadwell* v. *Getmann*, 3 Denio, 87, it was also held that unless the agreement can be completely executed on both sides within the year, it must be in writing.

This Court has already determined, and the counsel admit, that the contract could not be performed by *Ray* within the year. The bonds could not have been sold, and the profit and loss paid within the year.

But we insist that the acts which the petitioner claims to have performed, even if performed, and if that performance had been under his contract with the defendant, would not be such acts as to take the case out of the statute; for the reason that he can be compensated for those acts in damages. In the case of *Frost* v. *Beekman*, 1 Johns. Ch. 288, Chancellor KENT holds the rule to be, that when damages at law will afford the party compensation for his labor, or part performance, he must be content with that remedy. And he holds that, although the plaintiff in that case had made improvements on the land purchased, still he could be paid for those improvements, and the contract could not be enforced. He refers to the fact that fluctuating decisions on this point had been made by the Courts, but states this as the true rule.

In *Frame* v. *Dawson*, 14 Ves. 387, it is held that the act of a tenant rebuilding a party wall, is not sufficient to take the case out of the statute, as it admits of compensation. In *Armstrong* v. *Kattenhorn*, 11 Ohio R. 271; *Eckert* v. *Eckert*, 3 Penn. R. 332; 3 Swanst. 437; and also in Browne on Stat. of Frauds, § 452, the same rule is recognized.

STORY, J., quotes the rule, and states the reason why, in certain cases where the plaintiff had entered upon land purchased under a parol contract, and had made improvements, the acts had been held sufficient to take the case out of the statute. In such cases, the reason was, that the party performing the act would be liable to a suit for the very act, and should be allowed to interpose the defense of the verbal contract authorizing the act; "and if admissible for such a purpose, there seems no reason why it should not be admissible throughout." Story's Eq. Juris., § 761.

Now, if *Wilson* performed the labor of building the railroad, and received therefor the bonds, under his contract with the defendant, and not under his contract with the railroad company, he has the Courts of law open to him, and he can be paid for the labor. He can be compensated for all the work done, without having the statute of frauds violated for his relief. But we insist there can be no question that *Wilson* and *Vance* performed the work under their contract with the railroad company.

But part performance, when relied upon to take a case out of the statute, must be pleaded. See Browne on Stat. of Frauds, § 507. It has not been done either in the complaint or reply, and, of course, cannot be brought before the Court.

It therefore appears clearly that the act of part performance relied upon by the plaintiff, does not fulfill a single requisite of the law, and that the able opinion of this Court, delivered in this case, must be sustained, and a new hearing refused.